

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00057-CV

IN THE INTEREST OF N.W. AND
N.W.C., CHILDREN

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant Nannette W. Cooper (Mother) appeals from the trial court's final order in this suit for modification of the parent-child relationship initiated by Appellee Nathanael Cooper (Father). Mother contends in three issues that the trial court erred by not interviewing her daughter in chambers; erred by permanently enjoining Mother from filing complaints, grievances, or lawsuits against any of the experts involved in the case; and abused its discretion by

---

[1]See Tex. R. App. P. 47.4.

appointing Father as sole managing conservator with primary custody of their daughter because the evidence was factually insufficient to support the appointment. We modify the final order in part and affirm as modified.

## II. Background

Mother and Father were divorced in 2003. They have two children from their marriage, Nelson and Noelle.[2] At the time of divorce, Mother and Father were appointed joint managing conservators of the children with Mother having primary possession and Father having visitation rights. Father filed a petition to modify the parent-child relationship in June 2008, seeking health insurance and child-support modifications to reflect his new employment. Possession of Nelson and Noelle was not at issue in 2008 but had become the primary disagreement between Mother and Father by the time of the final hearing in October 2011. Nelson was seventeen years old, and Noelle was twelve at the time of the final hearing.[3]

### A. Court-Appointed Experts' Testimony

Dr. Donna Milburn testified at the final hearing that she was appointed by the trial court to perform psychological evaluations of Mother, Father, and Nelson. Dr. Milburn testified that she had conducted individual diagnostic

---

[2]We use aliases for the children to protect their identities. *See* Tex. R. App. P. 9.8(b)(2).

[3]Mother does not contest the portions of the final order relating to conservatorship and possession of Nelson.

interviews and "a battery of psychological tests"; that she had jointly interviewed Mother and Father; and that she had reviewed a series of documents including court documents and motions, a police report, progress notes and other therapy records, and information provided by the parties. Specifically concerning Nelson, Dr. Milburn reviewed information provided by Mother and Father, information from her two diagnostic interviews with Nelson, results from a group of objective psychological tests, and paperwork completed by one of Nelson's teachers.

Dr. Milburn testified that Nelson has "a lot of behaviors and symptoms that are consistent with the diagnosis of attention deficit disorder, predominantly the inattentive type." She described Nelson as "having a parent-child problem" in his interactions and contacts with Mother, but she also testified that she did not believe Nelson to be an overly aggressive child and that she felt Nelson had been honest with her when answering her questions.

Dr. Milburn testified that Mother has "some difficulty with interpersonal relationships, with perhaps at times having some paranoia [and] difficulty trusting people" and that Mother may have a personality disorder "like an antisocial personality disorder." Dr. Milburn testified that Mother was trying to present information in the best possible light rather than honestly and directly answering questions and that Mother would alter her answers to Dr. Milburn's questions based on her perception of Dr. Milburn's facial expressions. Dr. Milburn acknowledged that such conduct was not unusual in child-custody evaluations but testified that Mother's testing showed "an elevated score on the lie scale."

3

She also testified that Mother's testing results were consistent with her own interactions with Mother.

As for whether Mother could provide a safe, stable home for the children, Dr. Milburn testified that she could not answer questions about Noelle because she had not tested, interviewed, or spent any time with Noelle and that she could not simply extrapolate Nelson's situation to Noelle because each child has an individual personality and individual needs. Dr. Milburn did say, however, that past behavior has always been the best predictor of future behavior and that "there is a possibility that [Mother] could engage in the same kind of behavior with any other child."

On cross-examination, Dr. Milburn acknowledged that conflicts between teenage boys and their parents are not unusual. Referring to Nelson's comments that Mother would "throw him under the bus," Dr. Milburn testified that Nelson told her that Mother had lied to the police and filed a false charge of assault against him and that he had not hit Mother. Dr. Milburn agreed, though, that Mother maintained that Nelson had assaulted her. Dr. Milburn also agreed that Nelson was very angry about being arrested and placed into juvenile detention.

Dr. Milburn was asked about the allegation of sexual molestation made against Nelson just before a hearing in this case. Dr. Milburn testified that she was not surprised that Mother had made such an allegation just prior to a court hearing because, in her assessment of Mother, Mother is "manipulative in trying

to get whatever she wanted, consistent with [Nelson]'s statements [to Dr. Milburn] that his mother would throw him under the bus to win, and that for him to be charged or accused of being sexually assaultive to his sister would have been another one of those kinds of accusations." CPS investigated the sexual molestation allegation but ruled it out. Dr. Milburn testified that "it's better than a fifty-fifty chance" that Mother prompted Noelle to make the allegation against Nelson. Explaining why she believed these types of allegations are detrimental to the children, Dr. Milburn testified that it is "detrimental for children anytime there's a lot of conflict in the case . . . and [when] there's any kind of encouragement, emotionally or directly, to try and influence what the children say or think about their siblings or their other parent."

Dr. Milburn was also asked to define "enmeshed," and she testified,

> Enmeshed, in psychological theory, is very similar to what most people have heard as being codependent. It's when two individuals are so close together that sometimes they seem to share each other's emotions and perceptions and feelings.
> Enmeshment involves a lack of individual identity. So if one person in the enmeshment is upset, the other person's upset. If one person is happy, the other person is happy. And the two individuals are so close that the relationship is considered dysfunctional.

Dr. Milburn related that when one of the persons in the enmeshed relationship begins to pull away, the other person "become[s] angry and hostile alternating with clingy and trying to get the person back[,] and it can be a very volatile relationship between the two individuals." Dr. Milburn testified that therapy records in the case listed a goal of "working on the enmeshed relationship

5

between the mother and son," but Dr. Milburn was not asked whether she personally believed that Mother and Nelson had an enmeshed relationship.

Dr. Milburn testified that Nelson had said to her that "he was trying to get more independence from his mother" and that "he was trying to spend a little bit more time with his father." Dr. Milburn also testified that Nelson had expressed anger toward Mother's interference in his relationship with Father and had said that Mother told him she would never see him again if he went to live with Father. Dr. Milburn testified she was not surprised to learn Mother had not seen Nelson since Nelson had gone to live at Father's house. She also testified that a statement like the one Mother reportedly made to Nelson would be damaging to a child and that Mother not having seen Nelson could potentially harm Noelle.

Rahna Cutting was the court-appointed parenting facilitator. She testified that she met with Mother, Father, Nelson, and Noelle and spent three to five hours with each person, with some of that time as a group and some separately. Her last meeting with any of the family was in July or August 2009. Cutting testified that the conversations between Mother and Father were "somewhat tense" but that they were able to talk with one another about the children.

Cutting's impression of the family was that "there was a significant amount of conflict, not only between the parents, but where the children had been drawn into that." Cutting testified she had observed some conflict between Nelson and Noelle, with Noelle "preferring to protect mom" and Nelson "preferr[ing] to protect dad." She testified that the children "were used to create a lot of messages,

6

carrying back and forth, and to be spies" at Mother's request. Cutting learned about the spying requests from Noelle but testified that Mother denied having used the children as spies. Cutting explained that she discussed the issue with Mother in a generic way so that Mother would not feel accused or singled-out, but Mother responded that she did not wish to continue working with Cutting. Also, Mother had not been amenable to meeting with Cutting and Father to address interim plans for the children.

Dr. Michele Greer testified that she was appointed to provide family counseling in this case and that the appointment was requested by Mother's attorney. She first met with the family in November 2010. She met with Mother, Father, and Nelson individually; Mother and Father jointly; Father and Nelson jointly; Mother and Noelle jointly; and Nelson and Noelle jointly. Dr. Greer testified that there was a lot of conflict between Mother and Father and between Mother and Nelson. Dr. Greer spoke with court-appointed hearing facilitator Aaron Robb, the amicus attorney, and Mother's previous attorney and reviewed Dr. Milburn's report and other documentation provided by Mother. She described Nelson as cooperative and calm but with a lot of sadness and anger about his relationship with Mother.

Dr. Greer testified that her personal observations of Mother were consistent with those expressed by Dr. Milburn in her report, specifically in that Mother would get angry or discontinue meetings if Mother did not like what she was hearing. She also testified that she "had a lot of concerns" about whether

Mother was being honest with her and that her concerns were based on her interactions with Mother and her conversations with Father and Nelson. Dr. Greer testified that Father's and Nelson's versions of events were consistent and that when she addressed her concern with Mother, Mother would become very upset and try to change the subject. Dr. Greer also testified that Mother has "some difficulty with emotional regulation where she would either be very angry or very sad," adding that Mother at one point "threw herself down" on Dr. Greer's office floor.

Dr. Greer related an episode that had occurred in her office waiting room. Mother and Father were meeting with Dr. Greer, and Nelson was in the waiting room. Mother said "some pretty hurtful and harmful things" about Nelson, and Dr. Greer believed that Nelson could hear Mother's comments. Dr. Greer encouraged Mother to lower her voice and told Mother that she was concerned that Nelson could hear, but Mother said that she did not care and stormed out of the office. Dr. Greer testified that Mother had said that she would never be alone with Nelson, that he was not welcome at her house, and that he could not come over to her house. Dr. Greer opined that those types of statements are harmful for a child to hear from a parent. Dr. Greer also testified that those statements could be harmful to Noelle if Mother truly felt that way about Nelson.

Based on her interaction with the family through February 2011, Dr. Greer had concerns about Mother's ability to raise Noelle in a way that would support relationships between Noelle and Father and Noelle and Nelson. Dr. Greer

8

testified that Mother was "very resistant" to her recommendations to include Father in things involving the children. Specifically, Dr. Greer discussed with Mother how her behavior at school events put Noelle in the middle of the conflict between Mother and Father and how Noelle might be allowed to address both parents at once instead of having to choose one over the other. Dr. Greer testified that Mother "was constantly resistant to that and refused to follow any recommendations."

Dr. Greer also testified that parental alienation occurs when one parent "systematically attempts to exclude" the other parent from a child's life either physically or emotionally. She testified Mother had in some ways "made great effort to exclude [Father] from actively participating and interacting with [Noelle]." Dr. Greer testified that "the children need to be in an environment that's going to foster acceptance of both parents" but that Mother had not demonstrated an ability to do that. Dr. Greer testified that Father was "not without fault in the case" but that Father "always seemed to follow the recommendations in terms of the children." Father had brought Nelson for counseling, had wanted to start counseling for the entire family, and had requested counseling for Nelson and Noelle to improve their relationship.

Dr. Greer testified to several sessions with Noelle and several joint sessions with Noelle and Mother. She testified that Noelle would say certain things when she was with Mother, that Noelle would say very different things when she was with Father and Nelson, and that Noelle seemed "very stressed

9

and very torn." Dr. Greer stated that these types of discrepancies were not unusual in cases like this one but that Noelle's responses were abnormal even with that understanding.

Dr. Greer described Noelle and Nelson's relationship as "stressed." She testified that they were able to talk and joke with one another after a time but that "initially there was a lot of stress between the two of them and tension." She testified that Noelle "gets upset that she feels like [Nelson] says negative things about their mom" and that Nelson "feels that [Noelle] accepts their mom and plays into a lot of the things [Nelson] considers to be things that are not truthful." Dr. Greer was not concerned about the children spending time together but recommended that they be supervised. Dr. Greer testified that she had discussed appropriate safeguards with Father and that Father was willing and able to put those safeguards in place.

Dr. Greer also testified that Father discussed with her several times his decision to seek custody of Noelle. Dr. Greer testified that Noelle did not want to live with Father as of February 2011 but that she was not aware of Noelle's current wishes. Dr. Greer added, though, that she did not have concerns about Father having primary custody of Noelle. As for Mother, Dr. Greer expressed concern that Mother would not facilitate relationships between Noelle and Father and Noelle and Nelson. Dr. Greer also opined that Noelle's relationship with Mother could deteriorate in the future if Noelle disagrees with Mother or seeks

independence from Mother. In addition, Dr. Greer testified that she believed Mother had caused harm to Noelle by cutting off contact with Nelson.

Dr. Greer testified that Noelle likes to read, to work with crafts, and to play on her computer. Dr. Greer was aware that Noelle did not want Father to be on her computer, and Dr. Greer had been told that Father had called twelve-year-old Noelle a whore but said that she did not know whether that had actually occurred because she had received conflicting information about the allegation. Dr. Greer testified that Noelle had "misrepresented things [to her] on several occasions."

Dr. Greer testified that Mother and Noelle's relationship is enmeshed, and she described "enmeshed" as being

> like codependence. It's [where] there's two individuals. You can just -- the best way to describe it is kind of one body and two heads. And so that the thoughts, feelings, and actions are consistent. So it's like[] you're dealing with one individual. So if one person's happy, the other person's happy and doesn't have the ability to really be autonomous and have their own thoughts, feelings, and actions.

Dr. Greer testified that Mother and Noelle's relationship was, as of February 2011, enmeshed to the point of being unhealthy.

Dr. Greer did not believe Mother and Father would be able to reach agreements about the children's education, medical needs, or mental health needs. She opined that Father is better suited to make those decisions for the children because he tries to include Mother and does not try to exclude her. Dr. Greer also testified that even when Father had not agreed with Dr. Greer's recommendations, he had followed through on the recommendations without

11

threatening to terminate further services. Dr. Greer testified that if Mother and Father were ever going to be able to coparent the children, there would have to be very specific court orders in place with serious consequences for failure to comply. In Dr. Greer's opinion, some cases reach a point where courts have done all they can do, that one parent has to eventually be given exclusive responsibilities to the exclusion of the other parent, and that the parties had reached that point in this case.

## B. Father's Testimony

Father testified that when he and Mother divorced in 2003, they agreed to joint custody but that Mother had primary custody. Father testified that he and Mother had a "back and forth" ability to work with one another following their divorce and that although there were things that made him want to seek custody of the children, he did not choose to do so at that time.

Father testified that he and Nelson spend time together working on motorcycles. Noelle does not have the same interests, but Father testified that Noelle had not told him that she did not want to visit him on weekends. Father testified that he had attended the children's school functions and some of the children's parent-teacher conferences and medical appointments.

Father testified that he initiated the current litigation to put the children on his insurance plan through his new employer and to have his child support adjusted. He later decided to seek possession of Nelson because Mother was tormenting Nelson and had "set her sights out to destroy him," making false

accusations and getting him arrested. He testified that Mother did not stop until the court had removed all unsupervised contact between Nelson and Mother.

Father testified that he also did not initially intend to seek custody of Noelle but that he now did not feel he had any other choice, stating, "Given [Mother]'s previous behavior and her personality with my son, I think the threat is always there that she could turn on my daughter as she did my son." Father also expressed his belief that Mother, "through manipulation and deceit," had successfully alienated Noelle from him, Nelson, and the rest of Father's family. Father testified that he consulted his parents and Dr. Greer before deciding to seek custody of Noelle and that he had also talked with Nelson about his decision.

Father testified that he discussed with Dr. Greer the possibility of false accusations by Noelle against Nelson and that he planned to immediately have family counseling on a weekly basis to address any issues between the children before the issues escalated. Father also testified that he had a plan to help Noelle with any feminine issues that may arise in the future, using his own mother for help or having Noelle continue therapy with a female therapist with whom she could speak freely. Father testified that having Noelle reside with him was in her best interest because of Mother's alienating behavior and because of the history of the case, including the appointment of two parenting facilitators, several counselors, and psychologists. Father estimated that he had spent between $20,000 and $25,000 on experts in the case.

## C. Mother's Testimony

Mother testified that she has a degree in molecular biology with a minor in chemistry and a master's degree in molecular biology. At the time of the final hearing, she was working on a PhD, was a research associate, and was running a graduate lab. Mother testified that her job requires a lot of analytical thinking and questioning. She acknowledged that she had questioned a lot of what the experts had told her in the case, but she testified that she was not trying to be offensive.

Mother testified that she defines "coparenting" as the parents' "ability to communicate effectively for the children's needs." Mother testified that, between the time of divorce in 2003 and the time Father filed the motion to modify in 2008, Father had regular visitation with the children, she had not withheld visitations from Father, and she and Father had been able to talk with one another about the children. She testified that Father did not attend school events but that he was "religious" about visitations. Mother agreed that Father had helped Noelle with one science project but stated that he had not done anything else involving the children's schoolwork or school events. She said that she was "shocked" that Father sued her in 2008 and that she was concerned that she would lose her children.

Mother testified that the coparenting between her and Father ended in December 2008. When asked what happened in 2008, Mother stated, "He told me not to F with him, that his parents had money. He would make me miserable.

14

And then he assaulted my son." Mother testified that Father "threw [Nelson] into a closet door, breaking it" and that Father "lied about it on the stand in December of 2009."[4] Explaining why visitation exchanges occurred at a police station, Mother testified, "Because [Nelson] was exhibiting the aggressive behavior that he learned from his father[,] and [Father] was stalking [her] house." Mother further stated that Father "would park down the street in the dark and watch [her] house. He would drive by [her] house, drop things off on the porch, put things in [her] mailbox, and just drive down the street and try and catch the children outside." Mother testified that Father's behavior continued until August or September 2010 and that the court had ordered exchanges at the police station in November 2010.

Mother denied that she and Noelle have an enmeshed relationship, and she testified that she does not discuss the litigation with Noelle. Mother also testified that she has not thrown Nelson "under the bus," that the phrase is one that Father uses, and that she has attempted to place authority figures into Nelson's life so that he will have responsibility and accountability. Mother believed that Nelson and Noelle did not have problems in their relationship while they lived with her but that problems began after the litigation started. She testified that, after the litigation started, Nelson "hit [Noelle] at the university because she wouldn't get off the computer," and he "kicked her in the legs

---

[4]Father denied both of Mother's allegations during his testimony.

15

because she wanted to watch cartoons." Mother testified that Nelson had also called her and Noelle profane names and that the name-calling was causing problems for Noelle.

Mother testified that Nelson had trouble with destroying property while he lived with her and that Nelson had been suspended two days from school while living with Father for sexually harassing a male student. Mother described the incident as "calling names and making another student uncomfortable, just being a bully." Mother testified that Nelson had assaulted her "like five" times before she finally called the police as a last resort and that she was told that Nelson needed a wake-up call. Nelson was placed on probation after going to juvenile detention, and Mother testified that Nelson had written her a "beautiful letter." She testified that she and Nelson, near the time of the final hearing, communicated through text messages, and she said that they texted between twenty and forty times per week depending on the subject.

Mother testified that her relationship with Nelson was much less stressful once Nelson moved in with Father. She testified that Nelson's problems began at the end of 2008 when Nelson was fourteen and that his problems became increasingly worse. Mother acknowledged that she had possibly become overprotective of the children and that she could see Nelson's recent improvement. But Mother testified that it would not be a good thing for Noelle to also live primarily with Father, and she described Noelle's interests and the things she and Noelle do together.

16

Mother testified that she had not seen Nelson since Nelson went to live with Father because she could not afford the supervised visitations. Mother also testified that she and Father would be able to reach agreements on the children's education and medical needs and could communicate effectively about the children.

## D. Trial Court's Judgment

At the end of the hearing, the trial court orally pronounced that Father would be the sole managing conservator of both children, that Mother would be possessory conservator, and that Father would have the exclusive right to establish both children's primary residence, except that both children would remain in their current schools. The trial court ordered that Mother would have supervised possession of Noelle for four hours on the first and third Saturdays of each month and gave Nelson the option of choosing whether to visit Mother without any court-ordered visitation obligations. The trial court also announced that Mother would be permanently enjoined "from filing any complaint, grievance, or lawsuit against any expert involved in this litigation, be it attorney, psychologist, or counselor, or anyone else without express permission from the Court if related to professional conduct during this litigation." On November 17, 2011, the trial court signed a final order that was consistent with its oral pronouncements. This appeal followed.

17

### III. Interview of Child

Mother contends in her first issue that the trial court erred by refusing to interview Noelle as required by family code section 153.009(a). Father responds in part that the trial court acted within its discretion by refusing Mother's last-minute request for an in chambers interview.

Family code section 153.009(a) states:

> In a nonjury trial or at a hearing, on the application of a party, the amicus attorney, or the attorney ad litem for the child, the court shall interview in chambers a child 12 years of age or older and may interview in chambers a child under 12 years of age to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to determine the child's primary residence.

Tex. Fam. Code Ann. § 153.009(a) (West 2008). Section 153.009(c) states that "[i]nterviewing a child does not diminish the discretion of the court in determining the best interests of the child." *Id.* § 153.009(c).

There are two motions for the trial court to interview Noelle in the appellate record, and Mother points to both to support her argument that the trial court reversibly erred by not interviewing Noelle in chambers. On August 18, 2010, Mother filed a "Motion for Judge to Confer with Child." The parties had a temporary orders hearing the next day, but Mother did not bring her request for an interview to the trial court's attention at that hearing. Moreover, Noelle was eleven years old at the time that Mother filed the motion, meaning section 153.009(a) gave the trial court discretion and did not require that the trial court interview Noelle at the time. *See id.* § 153.009(a).

Mother filed her second motion for an interview on October 11, 2011, the day before the final hearing. During opening statements at the final hearing, Mother's counsel mentioned the recently-filed motion for the trial court to interview Noelle, and the following exchange occurred:

> [MR. BUCHANAN:] We have -- I filed, whether it's made it to the Court or not, a request for the Court to interview the child, you know, in chambers. I think it's required anyway under custody issues. So we're going to rely on the Court's wisdom in talking to the girl.
>
> We're content, Judge, under the last order. We're content without creating more problems and attorney's fees. Let the 17-year-old boy -- he needs to be with his dad anyway. They do motorcycles together and work on them and ride them and that type of thing, and they're father and son. He needs to stay with his dad. But at the same time, we're urging -- it's our position that the 12-year-old daughter needs to stay with the mother. Thank you.
>
> THE COURT: Let me just be clear. This case has been pending for some nearly three and a half years, and the first I'm hearing of any request to interview the child is today on the day of final trial. While the statute doesn't speak to timeliness of the request, I certainly don't consider the spirit of the statute to allow a party to wait until the very, very, very last minute to make that request.
>
> If I'm wrong about that, the Court of Appeals can tell me, but I don't intend to interview the child prior to rendering a final decision.
>
> MR. BUCHANAN: I think it had already been filed by another lawyer. I think that request had previously been filed by one of the other lawyers in this case. I think it was on -- 8-19-2010, she's telling me.
>
> THE COURT: Let me be clear. Lawyers file pleadings all the time, and sometimes those are mere strategic decisions, sometimes they're substantive requests. A motion has no meaning until it's urged. And all I'm saying is no one has asked this Court to interview

19

that child; that is, acted on that pleading, until today, to my knowledge.

MR. BUCHANAN: It's my understanding on that, Judge, that's to put the Court or just to inform the Court of what we're requesting. It's my understanding of the statute that if it's a custody issue that you don't have to even file a request anymore, if that's what the issue is.

It's also my understanding that there wasn't an issue about the girl up until late in this litigation. Was it not until -- well, May 18th, two thousand and, maybe, ten.

THE COURT: That's still a year and a half ago.

MR. BUCHANAN: Yeah, 2010. I don't believe that was an issue.

THE COURT: That was still a year and a half ago, and I'm simply saying I'm not going to delay the finality of this case that's been going on for three and a half years because, at the last minute, someone finally decides to ask me to interview the child. There are a lot of professionals that have been involved in the case, they're apparently ready to testify, and I'm going to rely upon their continuous and deep involvement in this case to guide the Court's final decision. And I'm not going to delay this final trial so that an interview with the child can be arranged.

So I appreciate your advocacy for your client, but I'm simply making clear that that's my intention. And if that's in violation of the statute, so be it. There's your first point of error.

Mother points to the legislature's use of the word "shall" in section 153.009(a) and argues that the trial court had a mandatory obligation to interview Noelle without regard to the timeliness of the motion. Addressing a prior version of section 153.009(a), this court has held that "a motion for new trial is too late a time to make application for a judge to interview the children and have the interview be mandatory." *Hamilton v. Hamilton*, 592 S.W.2d 87, 88 (Tex. Civ.

20

App.—Fort Worth 1979, no writ) (quoting relevant part of former family code section 14.07(c) to state that "[u]pon the application of any party and when the issue of managing conservatorship is contested, the court shall confer with a child 12 years of age or older"). Similarly, our sister court has held that because the mother presented her motion to interview the child on the same date as the hearing on the father's motion for summary judgment, "the trial court could reasonably conclude [the mother]'s motion was not timely and was made for purpose of delay." *In re J.G.M.*, No. 09-11-00368-CV, 2012 WL 1951119, at *3 (Tex. App.—Beaumont May 31, 2012, no pet.) (mem. op.).[5]

Here, Mother did not file her motion requesting that the trial court confer with Noelle until the day before the final hearing, and the trial court was clearly concerned that the late request was a dilatory tactic that would unnecessarily prolong what was already protracted litigation. Because this court has previously recognized that a request that a child be interviewed can be untimely and because our sister court has held that a trial court has discretion to deny a request for an interview if the request is presented on the day of the final hearing,

---

[5]In contrast, the Corpus Christi Court of Appeals has held that a trial court has no discretion to deny a request to interview a child that is at least twelve years of age because the statutory language is mandatory rather than discretionary. *In re C.B.*, No. 13-11-00472-CV, 2012 WL 3139866, at *6 (Tex. App.—Corpus Christi Aug. 2, 2012, no pet.) (mem. op.). The court did not, however, directly address the timeliness of the request and noted only that the request for an interview was made at the close of the evidence. *Id.* Even so, the court concluded that the trial court's "error was harmless and did not amount to reversible error." *Id.* at *7.

we cannot hold that the trial court erred by declining Mother's request that the trial court interview Noelle. *See Hamilton*, 592 S.W.2d at 88; *see also J.G.M.*, 2012 WL 1951119, at *3. And even if we were inclined to conclude that the trial court's refusal was error, Mother did not make an offer of proof as to what Noelle would have said to the trial court in an interview, meaning we are unable to determine whether the trial court's refusal was harmful. *See De La Hoya v. Saldivar*, 513 S.W.2d 259, 261 (Tex. Civ. App.—El Paso 1974, no writ) (overruling complaint that trial court erred by not interviewing all children involved in the case because, without a record or "bill of exception to show what the testimony of such child would have been," the court could not determine if alleged error was reversible); *see also* Tex. R. Evid. 103(a)(2) (providing that exclusion of evidence is not error unless the exclusion affects a party's substantial right and "[i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer, or was apparent from the context within which questions were asked"). We overrule Mother's first issue.

## IV. Permanent Injunction

Mother argues in her second issue that the trial court erred by including a permanent injunction against her in the final order. She argues that she had inadequate notice that Father would seek a permanent injunction, that the evidence is insufficient to support the permanent injunction, that the permanent injunction is beyond the trial court's authority, and that Father does not have

22

standing to seek injunctive relief on behalf of the professionals involved in the case.

The trial court's final order includes the following injunctive language:

> The Court finds that, because of the conduct of [Mother], a permanent injunction against her should be granted as appropriate relief because there is no adequate remedy at law.
>
> The permanent injunction granted below shall be effective immediately and shall be binding on [Mother]; on her agents, servants, employees, and attorneys; and on those persons in active concert or participation with her who receive actual notice of this order by personal service or otherwise.
>
> IT IS ORDERED AND DECREEED that [Mother] is permanently enjoined from filing any complaint, grievance, or lawsuit against any expert involved in this case, including any attorney, psychologist, or counselor, without express permission from the Court if such complaint, grievance or lawsuit is related to professional conduct during this litigation.
>
> [Mother] waives issuance [of] service of the writ of injunction, by stipulation or as evidenced by the signatures below. IT IS ORDERED that [Father] and [Mother] shall be deemed to be duly served with the writ of injunction.

To be entitled to a permanent injunction, the party seeking the injunction must plead and prove (1) a wrongful act, (2) imminent harm, (3) irreparable injury, and (4) absence of an adequate remedy at law. *See, e.g.*, *Indian Beach Prop. Owners Ass'n v. Linden*, 222 S.W.3d 682, 690 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The standard of review is abuse of discretion. *See Operation Rescue-Nat'l v. Planned Parenthood of Houston and Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998); *Synergy Ctr., Ltd. v. Lone Star Franchising, Inc.*, 63 S.W.3d 561, 564 (Tex. App.—Austin 2001, no pet.). A trial court abuses

its discretion by granting an injunction when it misapplies the law to established facts or when the evidence does not reasonably support the determination of the existence of a probable right of recovery or probable injury. *See Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 916 (Tex. App.—Dallas 2006, no pet.). Moreover, "a permanent injunction 'must not grant relief which is not prayed for nor be more comprehensive or restrictive than justified by the pleadings, the evidence, and the usages of equity.'" *Holubec v. Brandenberger*, 111 S.W.3d 32, 39 (Tex. 2003) (quoting 6 L. Hamilton Lowe, *Tex. Practice Series: Remedies* § 244 (2d ed. 1973)).

We hold that the trial court abused its discretion by including the permanent injunction in the final order. Father's pleadings did not include a request for a permanent injunction, and the trial court at the start of the final hearing denied Father's request for a trial amendment that would have added a request for a permanent injunction. *See Falor v. Falor*, 840 S.W.2d 683, 687 (Tex. App.—San Antonio 1992, no writ) (dissolving permanent injunction that father not go near the mother except to exercise child visitation because mother did not plead or prove necessity of permanent injunction). The permanent injunction cannot stand in the absence of pleadings requesting that relief, the granting of a trial amendment to add a request for permanent injunction, or trial of the issue by consent.[6] *See In re A.B.H.*, 266 S.W.3d 596, 599–601 (Tex. App.—

---

[6]Father does not argue that the issues surrounding the permanent injunction were tried by consent.

24

Fort Worth 2008, no pet.) (holding trial court abused its discretion by appointing father sole managing conservator in absence of pleading or trial by consent); *Falor*, 840 S.W.2d at 687 (dissolving permanent injunction in absence of pleading and proof); *see also* Tex. Fam. Code Ann. § 156.004 (West 2008) ("The Texas Rules of Civil Procedure applicable to the filing of an original lawsuit apply to a suit for modification under this chapter."); Tex. R. Civ. P. 301 (requiring that trial court's judgment conform to pleadings); *Flowers v. Flowers*, No. 14-11-00894-CV, 2013 WL 3808156, at *3 (Tex. App.—Houston [14th Dist.] July 23, 2013, no pet.) (holding trial court abused discretion by removing geographic restriction on mother's exclusive right to determine child's primary residence in absence of pleading requesting that relief or trial by consent); *In re J.A.L.*, No. 02-10-00374-CV, 2012 WL 858638, at *2–3 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.) (holding trial court abused discretion by rendering default judgment that modified conservatorship and child support because no pleading requested that relief). We sustain Mother's second issue and hold that the trial court abused its discretion by including the permanent injunction in the final order. We dissolve the permanent injunction and modify the final order to omit any reference to the permanent injunction.

## V. Custody Order

Mother contends in her third issue that the trial court abused its discretion by rendering judgment on factually insufficient evidence. Mother specifically challenges the portions of the trial court's order that appointed Father as sole

managing conservator for Noelle and that limited Mother's possession of Noelle to supervised visitations on the first and third Saturdays of each month.

## A.  Standard of Review

We review the trial court's decisions on custody, control, possession, and visitation for an abuse of discretion.  *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Newell v. Newell*, 349 S.W.3d 717, 720 (Tex. App.—Fort Worth 2011, no pet.).  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).  Factual sufficiency is not an independent ground of error in this context, but it is a relevant factor in deciding whether the trial court abused its discretion.  *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g).  We first consider whether the court had sufficient information upon which to exercise its discretion and then determine whether it erred in its application of that discretion.  *See Newell*, 349 S.W.3d at 720–21.  The best interest of the child is always the primary consideration in determining the issues of conservatorship and possession of and access to the child.  Tex. Fam. Code Ann. § 153.002 (West 2008); *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing nonexhaustive factors that court may use to determine best interest).

## B. Discussion

In part of her third issue, Mother discusses Dr. Greer's expert testimony about parental alienation syndrome. Mother argues that Dr. Greer's testimony should not have been admitted because Dr. Greer was not qualified to give that testimony, because Dr. Greer's testimony was inherently unreliable, and because Father did not disclose in discovery that he would present evidence about parental alienation syndrome. But Mother did not object to Dr. Greer's qualifications in the trial court. To the contrary, Mother stipulated that Dr. Greer was qualified as an expert witness. She cannot therefore complain about Dr. Greer's qualifications on appeal. *See Davis v. Jordan*, 305 S.W.3d 895, 899–900 (Tex. App.—Amarillo 2010, no pet.) (holding challenge to expert qualifications and reliability of underlying experiment not preserved when expert's reports admitted at trial without objection); *Harris Cnty. Appraisal Dist. v. Kempwood Plaza, Ltd.*, 186 S.W.3d 155, 158 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding challenge to expert qualifications not reviewable on appeal due to stipulation to qualifications at trial); *Marin v. Herron*, No. 04-11-00352-CV, 2012 WL 3205427, at *4 (Tex. App.—San Antonio Aug. 8, 2012, no pet.) (mem. op.) (holding complaints concerning witness qualification waived by failure to object in trial court). Mother also did not object in the trial court to the reliability of Dr. Greer's testimony or to Father's alleged failure to disclose the subject matter of Dr. Greer's testimony in discovery, meaning she has also not preserved those complaints for appeal. *See Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d

27

124, 146 (Tex. App.—Fort Worth 2011, pet. denied) ("'To preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony before trial or when it is offered.'") (quoting *Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002)); *see also* Tex. R. App. P. 33.1(a) (requiring timely objection and ruling from trial court as prerequisite to complaint on appeal); *Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 69 (Tex. App.—Texarkana 2000, no pet.) (holding defendants failed to preserve complaint about testimony on previously undisclosed theory of liability when objection first made after theory already introduced into evidence). We thus decline to exclude Dr. Greer's testimony from consideration in this appeal.

In the third part of her third issue, Mother argues that the trial court failed to consider a social study report prepared by Anne M. Scaggs in October 2009. But Father filed a motion to exclude any evidence from Scaggs on the ground that Scaggs was not licensed to conduct social studies, and the trial court ruled at a hearing in March 2010—approximately eighteen months before the final hearing—that Scaggs could not testify as an expert witness, that Scaggs's social study would be excluded from evidence, but that Scaggs could testify at the final hearing as a fact witness. Mother did not call Scaggs as a witness during the final hearing, nor did Mother ask the trial court to reconsider the exclusion of Scaggs's social study report. Family code section 107.0551(d)(1) clearly requires that the individual conducting a social study be "license[d] to practice in this state as a social worker, professional counselor, marriage and family

28

therapist, or psychologist." Tex. Fam. Code Ann. § 107.0511(d)(1) (West Supp. 2012). We therefore cannot hold that the trial court abused its discretion by excluding or not considering the social study prepared by the unlicensed expert. *See id.* *See generally Prellwitz v. Cromwell, Truemper, Levy, Parker & Woodsmale, Inc.*, 802 S.W.2d 316, 317–18 (Tex. App.—Dallas 1990, no writ) (holding trial court did not abuse discretion by excluding testimony from unlicensed expert). This is not to say that an expert must always have a license to be qualified to testify, s*ee Southland Lloyd's Ins. Co. v. Tomberlain*, 919 S.W.2d 822, 827 (Tex. App.—Texarkana 1996, writ denied), but the applicable statute in this case requires that the person preparing the social study be licensed. *See* Tex. Fam. Code Ann. § 107.0511(d)(1). We overrule this portion of Mother's third issue.

In the remainder of her third issue, Mother challenges the sufficiency of the evidence to support the trial court's modifications. She discusses the evidence presented at trial and primarily highlights the evidence relating to Nelson's behavioral problems and the problems in the relationships between Mother and Nelson, Father and Nelson, and Nelson and Noelle. Mother contends that the animosity between the parties and their children "subsided tremendously" during the fourteen months that Nelson had lived with Father and that Noelle had lived

29

with Mother. Mother also argues that the majority of the trial court's findings of fact and conclusions of law are not based on sufficient evidence.[7]

We first consider whether the court had sufficient information upon which to exercise its discretion. *See id.*; *see also Newell*, 349 S.W.3d at 720–21. The trial court heard testimony by Dr. Milburn, Dr. Greer, Cutting, Father, and Mother. The expert witnesses offered their opinions and testified that they had conducted interviews with Mother, Father, Nelson, and Noelle; that they had conducted psychological testing; and that they had reviewed documents related to the case and the parties' visits with other experts. The trial court did not interview Noelle in chambers but learned from Dr. Greer's testimony that, as of February 2011, Noelle did not want to live primarily with Father. Outside of Mother's request that the trial court interview Noelle, neither Father nor Mother suggested during the final hearing that the trial court needed additional information or evidence before it could render a decision in the case. Under these circumstances, we hold that the trial court had sufficient information upon which to exercise its discretion.

Concerning the trial court's exercise of discretion based on the available evidence, we do not repeat the evidence at length here. But from the evidence described above, the strain between Mother and Nelson is obvious, and the

---

[7]Although Mother occasionally mentions there being "no evidence" to support certain findings, she frames her third issue as challenging the factual sufficiency of the evidence and seeks remand for a new trial on conservatorship and possession. As stated above, factual sufficiency is not an independent ground of error in this context, but it is a relevant factor in deciding whether the trial court abused its discretion. *See T.D.C.*, 91 S.W.3d at 872.

experts testified that many of Nelson's adolescent issues arise from his relationship with Mother. Dr. Milburn testified that she could not directly answer whether similar problems would occur between Mother and Noelle but that it was possible in part because past behavior is the best predictor of future behavior. Dr. Greer testified that Noelle's relationship with Mother could deteriorate in the future if she seeks independence from Mother and that Mother's having cut off contact with Nelson had harmed Noelle.

The trial court also heard evidence that Mother had not been honest with the court-appointed experts, had manipulated information to present it in the best possible light, and had possibly fabricated a sexual molestation allegation against Nelson. The experts also testified about Mother's alienating behavior, her enmeshed relationship with Noelle, and how the children were caught in the middle of the conflict between Mother and Father. They also described how Mother's conduct and the ongoing conflict could affect the relationship between Noelle and Father.

Dr. Greer testified that Father was "not without fault in the case" but that he always seemed to follow through on her recommendations, even when he disagreed with them. Dr. Greer expressed concern with Mother's ability to raise Noelle in a way that would support a relationship between the children and Father and testified that Mother was "very resistant" to include Father in things involving the children. Dr. Greer also opined that Mother and Father would not

31

be able to agree on issues relating to the children and that Father would be better suited to make those decisions in the future.

Although much of the evidence presented at the final hearing was conflicting, we hold that the trial court did not abuse its discretion by removing Mother as one of Noelle's joint managing conservators, by appointing Father as Noelle's sole managing conservator, and by limiting Mother's possession of Noelle to supervised visitation on the first and third Saturdays of each month. The trial courts' resolution largely tracks the opinions expressed by the experts in their testimony, and the trial court was within its discretion to follow those recommendations. *See In re S.E.K.*, 294 S.W.3d 926, 928, 929–30 (Tex. App.— Dallas 2009, pet. denied) (holding trial court within its discretion to appoint father sole managing conservator and grant mother only supervised visitation with child and noting alienating conduct by mother); *Allen v. Mancini*, 170 S.W.3d 167, 170–71 (Tex. App.—Eastland 2005, pet. denied) (discussing mother's conduct and holding evidence supported modification of conservatorship and possession); *see also Silverman v. Johnson*, No. 03-08-00271-CV, 2009 WL 2902716, at *7 (Tex. App.—Austin Aug. 26, 2009, no pet.) (mem. op) (noting conflicting evidence, mentioning father's alienating behavior, and holding trial court did not abuse discretion by restricting father's visitation and access to child). We hold that the trial court had sufficient information available upon which to exercise its discretion and did not err in the application of its discretion by

32

determining that these changes were necessary and in Noelle's best interest. We overrule Mother's third issue.

## VI. Conclusion

Having overruled Mother's first and third issues and having sustained Mother's second issue, we dissolve the permanent injunction and modify the trial court's final order to omit the permanent injunction. We affirm the final order as modified.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  September 19, 2013

33